UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JULIE ROSENBAUM,

               Plaintiff,

                                           Case No. 21-cv-847-pp

   v.

ZORN COMPRESSOR & EQUIPMENT, INC.,

               Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 25)**

---

The plaintiff sued her former employer, alleging discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.* (ADA) and the Age Discrimination in Employment Act, 29 U.S.C. §621 *et seq.* (ADEA). The plaintiff alleges that the defendant failed to accommodate her disabilities, discriminated against her because of those disabilities and wrongfully terminated her because of her age. The defendant has moved for summary judgment on all claims. Because the plaintiff has failed to establish that she had a disability covered by the ADA and has not presented evidence of age discrimination, the court will grant the defendant's motion for summary judgment and dismiss the case.

**I.    Background**

The following facts are undisputed unless noted.

1

The defendant is a company based in Pewaukee, Wisconsin; it distributes compressed air equipment, parts and services. Dkt. No. 41 at ¶2. In June 2009, the defendant hired the plaintiff to work in its shipping and receiving department. Id. at ¶5. In 2016 or 2017, the plaintiff moved to the purchasing department. Id. at ¶7; Dkt. No. 42 at ¶5. In that department, the plaintiff assisted two other employees: Tom Yanke, the parts manager, and Dale Holland, the customer service/parts specialist. Dkt. No. 42 at ¶12. Remy Van Neck managed the purchasing department, which shared office space with the defendant's service department employees, including Mark Zeman, the defendant's service manager. Id. at ¶¶6, 8, 17-18, 22.

A.    Initial Complaints and Performance Review

Although the parties agree that the plaintiff started off well in the purchasing department position, Van Neck observed that the plaintiff's performance and efficiency began to slow down in the final year of her employment. Id. at ¶27. In fall 2019, Van Neck started to receive complaints from other employees who observed the plaintiff falling asleep at work. Id. at ¶¶28, 51. Zeman reported to Van Neck, and separately to Jeff Carlson (the defendant's vice president and general manager), that the plaintiff's sleeping at work was negatively impacting office morale. Id. at ¶¶9, 52. On February 18, 2020, Van Neck reported to Katie Marks, the head of human resources, that the plaintiff had been sleeping at her desk approximately two to three times per week. Id. at ¶¶ 10, 55. In addition to the incidents of sleeping, Zeman observed that the plaintiff had attendance issues. In late January 2020, Zeman sent an

2

email to Van Neck expressing concern about the plaintiff's attendance because she had been out for an unknown reason multiple times that week. Id. at ¶29.[1] Van Neck explained to Zeman that while the plaintiff was out, Zeman should be sending parts requests to customer service/parts specialist Mike Kowall and parts manager Yanke. Id. at ¶¶18, 29.

In April 2020, Van Neck notified vice president/general manager Carlson that he was receiving frequent complaints from the service department that the plaintiff was taking too long to order parts. Id. at ¶28. Van Neck met with the plaintiff in her office and informed her that if she continued to fall asleep at work, he would have to write her up. Id. at ¶57. The defendant argues that the plaintiff did not provide any explanation for why she was falling asleep, while the plaintiff contends that she told Van Neck that her doctor had suggested she go to a sleep clinic for testing and that the sleep issues could be related to medication Id.

During Van Neck's meeting with the plaintiff to discuss her 2019-20 performance review, Van Neck mentioned to the plaintiff that he had concerns that "the Service department was complaining that they weren't getting parts quick enough, and that [the plaintiff] wasn't adequately communicating with the Service department." Id. at ¶30. The plaintiff disputes that Van Neck mentioned anything about communication issues. Id. The plaintiff completed a self-evaluation of her 2019-20 performance in which she "recognized that she

---

[1] Zeman eventually would learn that the plaintiff was out because her mother had taken a fall. Dkt. No. 41 at ¶29.

3

still had some work to do to be proficient with the new version of [the defendant's] inventory program . . . ." Id. at ¶31.

On March 24, 2020, Van Neck texted the plaintiff to alert her that she'd been observed sleeping at work, id. at ¶59, and in September 2020, the plaintiff received a written warning for continued sleeping at work, id. at ¶61. After the September 2020 written warning, the plaintiff did not receive further write-ups regarding sleeping. Id. at ¶74. Neither party has identified any subsequent negative comments about the plaintiff's sleeping at work. Id.

B.      Sleep Apnea and Pulmonary Hypertension Diagnosis

In December 2020, Dr. Al-Saghir (certified in pulmonary, critical care and sleep medicine) diagnosed the plaintiff with sleep apnea and pulmonary hypertension and recommended she participate in a sleep study. Id. at ¶¶64-66. Al-Saghir concluded that the plaintiff's daytime sleepiness was not caused by any of her medications but was the result of her sleep apnea. Id. at ¶65. Despite the sleep apnea diagnosis, the parties agree that the plaintiff never told Al-Saghir or any other healthcare provider that she needed assistance in performing her job, never discussed any recommendations for how she could stay awake at work and never mentioned any absence from work or any other trouble performing her job because of her sleep issues. Id. at ¶67. The parties disagree over Al-Saghir's recommendation for an accommodation at work. According to the defendant, Al-Saghir opined that no accommodation would be helpful to the plaintiff, whereas the plaintiff argues that Al-Saghir stated the

4

defendant could have let her work shorter hours to accommodate her sleep apnea or given her a morning-only work schedule. <u>Id.</u> at ¶68.

Al-Saghir also diagnosed the plaintiff with pulmonary hypertension. <u>Id.</u> at ¶64. The plaintiff told Zeman about the pulmonary hypertension diagnosis. <u>Id.</u> at ¶69. The plaintiff subsequently told Van Neck and human resources director[2] Katie Marks about her pulmonary hypertension could not recall the specifics of what she told them; Marks recalled that that the plaintiff said she was going in for testing. <u>Id.</u> at ¶¶10, 70. After the plaintiff informed the defendant of her pulmonary hypertension diagnosis, Marks told the plaintiff that the company "would work with her as best they could with time off, and Marks also gave [the plaintiff] her FMLA forms." <u>Id.</u> at ¶71. The plaintiff acknowledged that she'd received the FMLA forms, but "reported back to Marks and Van Neck that the nurse 'said it was too soon for that.'" <u>Id.</u> at ¶72.

The plaintiff never provided the defendant with any work restrictions or medically necessary accommodations in connection with her sleep apnea or her pulmonary hypertension. <u>Id.</u> at ¶75. The plaintiff does not recall asking for any accommodation for her pulmonary hypertension. <u>Id.</u> at ¶78. With the medication she was taking for her hypertension, the plaintiff could perform her job without any accommodation. <u>Id.</u>

---

[2] The parties says that Marks is "responsible" for human resources, but do not provide an official title. Dkt. No. 41 at ¶¶10-11.

C.  <u>Knee Injury</u>

In January 2020, the plaintiff says that she "was pushing a box with her foot in the shipping area and she heard a pop and felt pain in her right knee, but she didn't need any medical assistance at the time." <u>Id.</u> at ¶80. The plaintiff did not seek medical attention until May 5, 2020, when her doctor released her to return to work without any restrictions and referred her to orthopedic surgeon Dr. Matthew Wichman. <u>Id.</u> at ¶81. When Wichman first treated the plaintiff on May 18, 2020, she reported no issues with performing her job (she had a "desk job"). <u>Id.</u> at ¶82. The plaintiff returned to work without restrictions and Wichman recommended she attend physical therapy. <u>Id.</u> at ¶82. Wichman opined that the plaintiff did not need any work-related restrictions and never issued the plaintiff any work restrictions or accommodations for her knee. <u>Id.</u> at ¶84. The plaintiff believes that Wichman advised her not to lift heavy items, but she never communicated this information to Marks or Van Neck. <u>Id.</u> at ¶85. The plaintiff shared her physical therapy schedule with Van Neck and the defendant did not deny any of her requests for time off to attend physical therapy. <u>Id.</u> at ¶¶86, 90. The defendant accommodated the plaintiff's knee injury by offering her a parking spot closer to the building and providing her with a new chair, which she said helped her knee. <u>Id.</u> at ¶¶87, 90. The plaintiff says it was uncomfortable for her to sit (even with the new chair), but she never communicated this concern to the defendant; instead, she tried to adjust and re-adjust the chair. <u>Id.</u> at ¶91.

6

The defendant also "relieved" the plaintiff from performing physical inventory ("which was not part of her normal job duties"), a task that required employees to be on their feet for most of the day. Id. at ¶88. The plaintiff disagrees that she was "relieved" of performing physical inventory; although she agrees she did not do the inventory in fall 2020 as she had in previous years, but she denies that she asked to be relieved from the task. Id. She says that she actually asked to perform inventory but was denied the opportunity because of her disabilities and health conditions. Id.

The plaintiff never provided the defendant with any work restrictions or medically necessary accommodations in connection with her knee injury and never submitted any requests for an accommodation in accordance with the defendant's policy for workplace accommodation requests. Id. at ¶¶75, 92, 95. The plaintiff says she hinted to Van Neck about working from home but could not "identify a time frame when that occurred or anything else about when the requests might have been made, and she never talked to Marks about working from home." Id. at ¶94. The only time that Carlson, Ven Neck and Marks "understood" the plaintiff to be asking to work from home was in November 2020, when the plaintiff had close contact with a COVID-positive co-worker. Id. at ¶98. Although the defendant was allowing other employees to work from home at that time, Marks recommended the defendant deny the plaintiff's request to work from home because the plaintiff could only do part of her job from home, due to potential security concerns, "to avoid requests to work from home simply for convenience" and because the defendant could pay the

7

plaintiff Employee Paid Sick Leave benefits. Id. at ¶¶98-99. The plaintiff contends that Marks also was concerned that the plaintiff would ask to work from home moving forward if the defendant granted the initial request. Id. at ¶99.

D.  Elimination of the Plaintiff's Position

The defendant says that because members of the service department "believed that parts were not getting ordered in a timely fashion," the service department decided to begin ordering parts as "next day air" to be delivered directly to the defendant rather than having the plaintiff expedite the parts. Id. at ¶109. The plaintiff disputes this, asserting that Zeman testified that he and Van Neck "decided to have parts ordered for the customer directly because of the amount of time off Plaintiff was taking." Id. Around summer or fall 2020, Yanke and Kowall began "to do some expediting." Id. at ¶108. At an unspecified time, Carlson—who spoke with department managers weekly—learned from Zeman that the service department was not using the plaintiff for expediting. Id. at ¶110. The parties dispute whether Zeman told Carlson that Kowall and Yanke's expediting work was an improvement over the plaintiff's. Id. Although Zeman and Carlson did not discuss eliminating the plaintiff's position, Carlson later made the decision to eliminate her position "because he believed it would create efficiencies in the Purchasing Department." Id. at ¶111. The plaintiff acknowledges that Yanke and Kowall "had better strengths with the parts" and that sometimes other individuals could expedite parts faster than she could. Id. at ¶119.

On March 3, 2021, Van Neck notified the plaintiff that after looking at workloads, her position was being eliminated; the plaintiff "was given" a termination latter confirming that the position was being eliminated. Id. at ¶¶121, 122. Carlson did not review the plaintiff's attendance history prior to making the decision to eliminate the plaintiff's position and says that he did not rely on any other facts in eliminating the position. Id. at ¶120. Carlson says that he had no knowledge of the plaintiff's diagnosis relating to sleeping, other than witnessing her sleeping. Id. The defendant offered the plaintiff a severance package, which the plaintiff declined. Id. at ¶123. The plaintiff was fifty-one years old at the time of her termination. Id. at ¶131. The parties dispute Van Neck's and Yanke's ages at the time but agree that both were older than the plaintiff. Id. Kowall was forty years old at the time of the plaintiff's termination. Id. There is no dispute that neither Van Neck nor Carlson knew the plaintiff's age at the time her position was terminated. Id. at ¶132.

After the plaintiff's termination, Van Neck assumed responsibility for receiving items in the computer system, Yanke took over purchasing and Kowall became responsible for expediting. Id. at ¶124. Yanke and Van Neck took over most of the plaintiff's duties. Id. at ¶125. The parties dispute whether there was, at the time the plaintiff's position was eliminated, any other position the defendant could have moved her into; the defendant says there was not, while the plaintiff says that the company was considering hiring a third service coordinator. Id. at ¶129. The defendant asserts that the decision to hire a third

9

service coordinator didn't happen until months after the elimination of the plaintiff's position. Id.

## II.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not

10

extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. Smith Amundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

### III.   The Parties' Arguments

#### A.    Failure to Accommodate Claims

The defendant argues that the plaintiff's failure to accommodate claims fail as a matter of law because the plaintiff was not disabled, the defendant accommodated her and there was no medical need for her to work from home. Dkt. No. 26 at 11.

##### 1.    *Disability*

The defendant argues that none of the plaintiff's conditions constitute disabilities under the ADA. Dkt. No. 26 at 11–12. The defendant contends that the plaintiff testified at her deposition that she did not request or require an accommodation for her sleep apnea or her pulmonary hypertension, and that even though she inquired about working from home due to her knee injury, she was released to return to work after the injury without any restrictions. Id.

The plaintiff responds that during her employment she endured several physical impairments which "substantially limited one or more major life activities" as defined under the ADA. Dkt. No. 36 at 7–8. She argues that her

11

knee injury—ultimately diagnosed as a medial meniscus tear and an avascular necrosis of the lateral femoral condyle—caused her "significant, and even debilitating pain, and additionally impacted her activities of daily living including walking and going up stairs." Id. at 8. She contends that her sleep apnea also significantly impacted her daily life by affecting her memory, sleep and ability to stay awake during the day. Id. The plaintiff argues that a lack of work restrictions does not automatically equate to a lack of an ADA-covered disability. Id. at 9.

The defendant replies that to the extent the plaintiff's conditions caused the limitations described in her brief, the defendant was obligated to accommodate those limitations only if they were *known* to the defendant. Dkt. No. 40 at 2–3. The defendant argues that the plaintiff does not dispute that she returned to work without restrictions for her knee injury, and does not dispute that she never sought accommodations for her sleep apnea, so the defendant was under no obligation to infer accommodations were necessary. Id. at 3–4.

2. *Reasonable Accommodation*

The defendant argues that because the plaintiff admitted in her deposition that she never requested or required an accommodation for her sleep apnea or pulmonary hypertension, the court should dismiss her failure to accommodate claim based on those medical conditions. Dkt. No. 26 at 12. The defendant contends that to the extent that the plaintiff's knee injury constitutes a disability under the ADA, the defendant provided a reasonable accommodation for it. Id. The defendant says that it offered and allowed the

12

plaintiff to park closer to the building, relieved the plaintiff from participating in the physically demanding inventory process and gave her time off to attend physical therapy appointments. Id. To the extent that the plaintiff alleges that the defendant failed to provide her running boards for the company truck, the defendant argues that the plaintiff made that request two years before the knee injury. Id. at 13.

The defendant also argues that the plaintiff's contention that she asked to work remotely as an accommodation must fail because she cannot identify any specific requests to work from home (other than the one she made when she came in close contact with a COVID-positive co-worker). Id. at 14. The defendant argues that the plaintiff only "hinted" at working from home but never explained that she wanted to do so because of her knee injury. Id. The defendant insists that the plaintiff never talked to her doctor about needing to work from home, never provided the defendant with any documentation demonstrating a medical need to work from home and that the plaintiff's own physician believed that working from home was not medically necessary. Id.

The defendant contends that even if the plaintiff could show that she had asked to work from home because of her medical condition, working from home was not a "reasonable" accommodation because the plaintiff could not perform the essential functions of her job remotely. Id. at 15. The defendant maintains that while the plaintiff could have performed computer work from home, she could not have performed other essential job functions like taking calls from customers and vendors and scanning paperwork. Id. The defendant argues

13

that the plaintiff "cannot identify which essential functions of her job she was unable to perform as a result of her knee condition, nor does she establish how the requested accommodation would have allowed her to perform those essential functions." Id. at 16.

The plaintiff replies that the defendant cannot argue that it was unaware of the need to accommodate her sleep apnea. Dkt. No. 36 at 10. The plaintiff argues that instead of engaging with her to determine an appropriate accommodation, the defendant "bur[ied] its head in the sand." Id. at 11. Regarding her knee injury, the plaintiff does not dispute that the defendant provided her a closer parking spot but disputes that the defendant allowed her to take time off work for her medical appointments without suffering negative consequences. Id. The plaintiff maintains that the defendant punished her for poor attendance because she took time off for her appointments. Id.

B.    Discriminatory Termination

The defendant argues that the plaintiff cannot establish that she was meeting the defendant's reasonable job expectations at the time her position was eliminated. Dkt. No. 26 at 17. The defendant points to the performance concerns documented in the plaintiff's 2020 performance review, which included issues with the plaintiff's communication and ability to meet deadlines, among others. Id. at 18. The defendant argues that the plaintiff's job duties were taken over by three individuals, all of whom are, like the plaintiff, over forty years old and thus in the same protected class. Id. at 19.

14

The defendant argues that even if the plaintiff could establish a *prima facie* case of age or disability discrimination based on the elimination of her position, the plaintiff's claims still must fail because she cannot prove that the defendant terminated her "because of" her age or disability. Id. at 20. The defendant argues that it eliminated the plaintiff's position to increase operational efficiencies, which it contends is a legitimate, nondiscriminatory reason. Id. at 19–20. The defendant argues that at most, the plaintiff can point to Van Neck, who made stray remarks about the plaintiff's age despite being six years older than the plaintiff, but it asserts that none of these comments were tied to Carlson's decision to terminate the plaintiff. Id. The defendant argues that Carlson had no idea about any of the plaintiff's medical conditions when he made the decision to terminate her. Id. at 22. The defendant contends that the plaintiff has only speculated that the defendant was motivated to terminate her because of her age or medical conditions but has not shown any actual evidence that the defendant ever considered her age or medical conditions when deciding to eliminate her position. Id. at 23.

The plaintiff disputes the cause of her termination, arguing that the defendant terminated her because of her perceived disabilities or her age, not because of an alleged reduction in force. Dkt. No. 36 at 18. The plaintiff argues that the defendant did not eliminate any other position in the two years prior to the plaintiff's termination and did not eliminate any other position in the year-and-a-half after her termination. Id. The plaintiff supports her claim by pointing to comments made by her direct supervisor and Zeman, who both

15

complained about her sleeping at work. Id. The plaintiff also contends that when a non-disabled employee in the Purchasing Department performed inefficiently, the defendant did not terminate that individual and that that individual remains employed in a supervisory role. Id. at 18–19. The plaintiff argues that the two non-disabled employees in her department were not considered for termination, implying that her disability was a motivating factor in the decision. Id. at 19.

C.    Mitigation of Damages

The defendant insists that even if the plaintiff's claims survive summary judgment, the plaintiff cannot seek damages for back pay. Dkt. No. 26 at 24. The defendant argues that the plaintiff was required—and failed—to mitigate her damages because she admitted to not looking for another position following her termination. Id. at 25.

The plaintiff maintains that the court cannot make a determination on damages until it makes a finding that the defendant engaged in employment discrimination. Dkt. No. 36 at 19. The plaintiff also argues that the defendant has not met its burden of proving its failure-to-mitigate defense. Id. at 20. The plaintiff asserts that the defendant has presented no evidence to show that there was a reasonable chance that the plaintiff could have found comparable employment. Id. at 20–21. Conversely, the plaintiff argues that she *has* presented evidence of her attempt to mitigate damages by searching for jobs, registering with employment agencies and discussing job opportunities with friends and acquaintances. Id. at 21.

16

## IV. Analysis

### A. ADA Failure to Accommodate Claims (Counts One and Two)

"'The ADA requires employers to make reasonable accommodations for a qualified individual with a disability.'" McAllister v. Innovation Ventures, LLC, 983 F.3d 963, 967 (7th Cir. 2020) (quoting Taylor-Novotny v. Health Alliance Medical Plans, Inc., 772 F.3d 478, 493 (7th Cir. 2014)). "A claim for failure to accommodate under the ADA . . . requires proof (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to accommodate his disability reasonably." Scheidler v. Indiana, 914 F.3d 535, 541 (7th Cir. 2019) (emphasis omitted). "The ADA defines a disability as: '(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" Richardson v. Chi. Transit Auth., 926 F.3d 881, 886 (7th Cir. 2019) (quoting 42 U.S.C. §12102(1)). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Brumfield v. City of Chi., 735 F.3d 619, 631 (7th Cir. 2013) (quoting 42 U.S.C. §12111(8)). "[T]he reasonable-accommodation requirement applies only to the known physical or mental limitations of *otherwise* qualified individuals." Id. at 632 (emphasis in the original). "[A]n employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of her job—not because such an accommodation might be unreasonable, but because

17

the employee is fully qualified for the job without accommodation and therefore is not entitled to an accommodation in the first place." Id. (citations omitted).

> A disabled employee who is capable of performing the essential functions of a job in spite of her physical or mental limitations is qualified for the job, and the ADA prevents the employer from discriminating against her on the basis of her irrelevant disability. But since the employee's limitations do not affect her ability to perform those essential functions, the employer's duty to accommodate is not implicated.

Id. at 633 (citations omitted).

The plaintiff argues that both her sleep apnea and knee injury constitute disabilities under the ADA because both substantially limited one or more major life activities. Dkt. No. 36 at 8. The defendant argues that the court need not determine whether the plaintiff's sleep apnea constitutes a disability under the ADA because she never requested an accommodation for it and that the plaintiff's knee injury was not a disability under the ADA because the plaintiff was able to work with the injury without work restrictions. Dkt. No. 26 at 12.

### 1. *Sleep Apnea*

Both the plaintiff and the defendant spill much ink arguing about whether the plaintiff's sleep apnea constitutes a disability under the ADA. Although the Seventh Circuit has found, at least once, that sleep apnea could qualify as a disability, Tate v. Ancell, 551 F. App'x 877, 885 (7th Cir. 2014), this debate is moot because the amended complaint (Dkt. No. 12) does not allege that the plaintiff suffered from sleep apnea, or that it was a qualifying disability, or that the defendant failed to accommodate it. The words "sleep apnea" do not appear in the amended complaint. The plaintiff's first cause of

18

action alleges that the defendant failed to reasonably accommodate her knee injury; her second cause of action alleges that the defendant failed to accommodate her pulmonary hypertension. Dkt. No. 12 at 7-9. Although the plaintiff alleges that she was punished for "falling asleep at work," she makes that allegation under her third cause of action, discrimination under the ADA. Id. at 10. Because the plaintiff has not pled a failure to accommodate claim based on her sleep apnea, the plaintiff cannot pursue that claim. The court need not resolve the parties' dispute regarding whether sleep apnea can constitute a qualifying disability under the ADA.

### 2.    *Pulmonary Hypertension*

The defendant argues that it is entitled to summary judgment on the plaintiff's claim that it failed to reasonably accommodate her pulmonary hypertension because the plaintiff did not request or require an accommodation for her heart condition. Dkt. No. 26 at 11–12. The plaintiff has not responded to *any* of the defendant's arguments concerning her pulmonary hypertension—the basis of her second cause of action and presumably part of her third cause of action. In discussing in her opposition brief the ADA's definition of a qualifying disability, the plaintiff mentions two alleged disabilities—the meniscus tear in her knee and "severe sleep apnea." Dkt. No. 36 at 8. Just as the words "sleep apnea" do not appear in the amended complaint, the words "pulmonary hypertension" do not appear in the plaintiff's opposition brief. The plaintiff has not identified any record evidence showing that her pulmonary hypertension constituted a disability under the ADA, or

19

identified any caselaw recognizing pulmonary hypertension as a disability under the statute.

The May Clinic defines pulmonary hypertension as "a type of high blood pressure that affects the arteries in the lungs and the right side of the heart," www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697. Even if the plaintiff had identified evidence supporting a claim that her pulmonary hypertension constituted a "disability" as defined by the ADA, she has identified no evidence that she sought an accommodation for it. Nor has she identified any evidence that the pulmonary hypertension was "relevant" to her job duties; she concedes that she was able to perform her job without any accommodation for the pulmonary hypertension. Dkt. No. 41 at ¶79. The court will grant summary judgment for the defendant on the plaintiff's second cause of action.

### 3. *Knee Injury*

This leaves the question of whether the plaintiff has provided sufficient evidence to survive summary judgment on her failure to accommodate claim concerning her knee injury.

Citing Wheatley v. Factory Card & Party Outlet, 827 F.3d 412 (7th Cir. 2016), the defendant contends that the plaintiff's knee injury did not render her disabled under the ADA because she was released to work without restrictions. Dkt. No. 26 at 12. In Wheatley, the plaintiff challenged the district court's finding that she had failed to demonstrate sufficient evidence for a jury to conclude that she was a *qualified individual*. Id. at 418. Whether a plaintiff is

a "qualified individual" under the ADA presents a separate question from whether a plaintiff has a "disability." <u>Compare</u> 42 U.S.C. §12111(8) (defining "qualified individual" as an individual who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires") <u>with</u> 42 U.S.C. §12102 (1) (defining a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of [the] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."). <u>Wheatley</u> does not discuss the quantum of evidence a plaintiff must present at summary judgment to establish a "disability," and does not support the defendant's argument that the absence of a work restriction necessarily prevents a finding that that the plaintiff had a disability under the ADA. To determine whether the plaintiff's knee injury constitutes a disability under the ADA, the court must determine whether the plaintiff has presented evidence upon which a reasonable jury could rely to find that the knee injury substantially limited one or more major life activities. <u>See</u> 42 U.S.C. §12102(1)(A).

The plaintiff argues that her knee injury caused her "significant, and even debilitating pain, and additionally impacted her activities of daily living including walking and going up stairs." Dkt. No. 36 at 8. She says that the pain from her knee injury affected her concentration at work. Dkt. No. 35 at ¶31. But the plaintiff has not identified evidence upon which a reasonable factfinder

could rely in determining that the knee injury's impact on her concentration significantly limited her ability to work. The plaintiff testified:

> Q:   Did you feel that the pain affected ability to work at all?
> A:   I know it affected my concentration.
> Q:   In what way did it affect it?
> A:   It was distracting, and I'm sure I was probably more irritable.

Dkt. No. 33-1 at 39, Tr. p. 152, lines 7-11. Evidence that the plaintiff's concentration was "affected," that the pain was "distracting" and that she believes she was more irritable is not sufficient to establish that her knee injury *substantially* limited her ability to concentrate at work as compared to most people in the general population. 29 C.F.R. §1630.2(j)(1)(iv).

The plaintiff also argues that her knee injury substantially limited her ability to walk. "To be disabled with regard to the major life activity of walking, the employee must be 'substantially limited' in her ability to walk, and the limitation must be permanent or long term, and considerable compared to the walking most people do in their daily life." EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 802 (7th Cir. 2005). It is undisputed that in January 2020 the plaintiff injured her right knee and in May 2020 she was diagnosed with right knee medial meniscus tear and an avascular necrosis of the lateral femoral condyle. Dkt. No. 41 at ¶80; Dkt. No. 42 at ¶90. But the plaintiff has not identified any record evidence showing that her knee injury substantially limited her ability to walk during this time. To the contrary, when asked whether he remembered anything about the plaintiff's claim that she was

having difficulty going up and down the stairs, Dr. Wichman responded "I don't." Dkt. No. 33-39, Tr. p. 42, lines 11-15.

Although the plaintiff contends that individuals with her knee injury can have limited mobility in extension and other abnormalities for loss of function, the portion of Dr. Wichman's deposition testimony to which she cites does not demonstrate that the plaintiff, *herself*, suffered from any loss of function. When asked whether there were any limitations for an individual with the patient's injury, Wichman testified:

> I mean, besides pain, nothing. There's no activity restrictions I would have for this patient. Surgically we attempted to inject some tissues, some – it's caked demineralized bone matrix – into the – that area to stimulate some healing response, and – and revascularize the bone there, but I wouldn't – besides the perioperative period, I wouldn't have any formal restrictions on that patient.

Id., Tr. p. 45, lines 11-23.

It is undisputed that in 2021, during the three months prior to her termination, the plaintiff "had difficulty with walking and even began using a cane in the beginning of 2021 to assist her walking." Dkt. No. 42 at ¶33. But the plaintiff testified that she never used her cane while she was at work. Dkt. No. 33-1 at 37, Tr. p. 143, lines 18-20. According to the plaintiff's own testimony, the cane was more of a "precaution, but there were a few days I definitely could have used it." Id. at 43, Tr. p. 177, lines 21-23. The plaintiff's own admission that she could move around without her cane would preclude a jury from finding that she was substantially limited in her ability to walk.

Because she has not shown that her knee injury substantially limited a major life activity, the plaintiff has not established that her injury constitutes a

disability under the ADA. See Fleishman v. Continental Cas. Co., 698 F.3d 598, 607 (7th Cir. 2012) (citation omitted) ("[T]he existence of a medical condition alone is insufficient to satisfy the ADA.").

The plaintiff's inability to show that her knee injury constitutes a disability under the ADA precludes her from moving forward with her failure to accommodate claim. But even if she could show that her knee injury qualified as a disability under the ADA, her claim would fail because the defendant has presented evidence that it provided her a reasonable accommodation. It is undisputed that after the plaintiff sought medical attention for her knee injury in May 2020, the defendant accommodated her by offering to change her parking spot to one closer to the building. Dkt. No. 41 at ¶87. The defendant gave the plaintiff time off to attend physical therapy sessions, did not deny her time off and provided her with a new chair, which she said helped her knee. Id. at ¶90. The defendant also prevented the plaintiff from participating in the physical inventory (in which she had participated in the past), which would have required her to be on her feet most of the day. Dkt. No. 38-1 at 4, Tr. p. 36, lines 10-12. The plaintiff does not dispute these facts, nor has she identified any other reasonable accommodation that she did not receive (or requested).

The court will grant summary judgment for the defendant on the first cause of action.

B.     ADA Discrimination Claim (Count Three)

Section 12112(a) of the ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Kurtzhals v. County of Dunn, 969 F.3d 725, 728 (7th Cir. 2020) (quoting 42 U.S.C. §12112(a)). "[A] plaintiff must show that: 1) [s]he is disabled; 2) [s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; 3) [s]he suffered an adverse employment action; and 4) the adverse action was caused by his disability." Id. (citing Roberts v. City of Chicago, 817 F.3d 561, 565 (7th Cir. 2016)).

Having determined that the plaintiff has not identified sufficient record evidence to show that her knee injury or pulmonary hypertension constituted a disability under the ADA, the plaintiff cannot establish an ADA discrimination claim and the defendant is entitled to summary judgment on the third cause of action.

C.     ADEA Discrimination Claim (Count Four)

The ADEA, which covers workers forty years of age and older, "makes it unlawful for an employer . . . 'to fail or refuse to hire to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" Carson v. Lake County, Ind., 865 F.3d 526, 532 (7th Cir.

25

2017) (quoting 29 U.S.C. §623(a)(1)). "To recover under a theory of disparate treatment in the ADEA, 'it is not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for [her] age, the adverse action would not have occurred.'" Tyburski v. City of Chicago 964 F.3d 590, 698 (quoting Wrolstad v. Cuna Mut. Ins. Soc'y, 911 F.3d 450, 454 (7th Cir. 2018)). A plaintiff alleging age discrimination may choose to proceed under the McDonnell Douglas burden-shifting framework (among other methods). Tyburski, 964 F.3d at 598 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). The McDonnell Douglas analysis, however, "'is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's' age or another proscribed factor." Id. (quoting Johnson v. Advocate Health & Hosps. Corp., 892 F.3d 887, 894 (7th Cir. 2018)). "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her age." Id. (quoting Skiba v. Ill. Centr. R.R. Co., 884 F.3d 708, 720 (7th Cir. 2018)).

Under McDonnell Douglas, the plaintiff can make a *prima facie* case of age discrimination by demonstrating that (1) she is protected under the ADEA; (2) she performed her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment. Tyburski, 964

F.3d at 598. "In a mini-[reduction-in-force] case, where the dismissed employee's duties are absorbed by another employee or employees rather than eliminated, the court applies a modified version of the fourth prong of the prima facie case." Petts v. Rockledge Furniture LLC, 534 F.3d 715, 725 (7th Cir. 2008). This modified version requires proof that the plaintiff's duties were absorbed by employees *not* in the protected class. Id. If the plaintiff is able to establish a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence demonstrating that it made the adverse employment decision based on legitimate, nondiscriminatory reasons. Id. If the defendant successfully demonstrates a legitimate, nondiscriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff to show that the proffered reason is pretextual. Id.

The plaintiff was fifty-one years old at the time at the time of her termination, which means that she is covered by the ADEA. See 29 C.F.R. §1625.2. There is no dispute that her termination constitutes an adverse employment action. See Barton v. Zimmer, Inc., 662 F.3d 448, 454-55 (7th Cir. 2011) (explaining that an adverse employment action under the ADEA includes termination from employment). That leaves the question of whether a reasonable factfinder could conclude that the plaintiff was meeting her employer's legitimate expectations and whether the plaintiff's duties were absorbed by employees not in the protected class.

Whether a plaintiff was meeting her employer's legitimate expectations requires the court to look at the plaintiff's performance "through the eyes of her

27

supervisors at the time of her . . . termination." <u>Gates v. Caterpillar, Inc.</u>, 513 F.3d 680, 689 (7th Cir. 2008). As the defendant points out, it is undisputed that in April 2020, Van Neck notified Carlson that he was receiving frequent complaints from the service department that the plaintiff was taking too long to order parts. Dkt. No. 41 at ¶28. It also is undisputed that in late January 2020, Zeman advised Van Neck that the plaintiff had been out for an unknown reason multiple times that week and that he wasn't sure who should handle parts requests. <u>Id.</u> at ¶29. Van Neck also expressed his concern to Carlson and Matt Zorn, the CEO and president, that the plaintiff was not quickly following up on delays in expediting, causing the service department to have to reschedule dates with customers to change delivery dates. <u>Id.</u> at ¶34.

In the plaintiff's 2019-20 performance review, Van Neck communicated to her that the service department was complaining that it was not receiving parts quickly enough. <u>Id.</u> at ¶30. In the review, he recounted that the plaintiff's productivity had decreased in the past year and that while she had done a good job of ordering and even expediting, "sometimes communication to others and follow ups with vendors on past due purchase orders lag behind." Dkt. No. 33-24 at 9. The plaintiff confirmed in her deposition that Van Neck told her that she wasn't doing enough when it came to expediting parts and that the service department was complaining that it wasn't receiving parts quickly enough. Dkt. No. 33-1 at 13, Tr. p. 48, lines 16-25; Tr. p. 49, lines 1-9. The plaintiff also admitted in her self-evaluation for this same period that she still "ha[d] a few hurdles to get over" in reference to trying to learn the new inventory program.

28

Id. at 16, Tr. p. 60, lines 3-17. The plaintiff conceded in her deposition that she believed that her coworker Yanke could expedite parts faster than she could. Id. Tr. p. 58, lines 4-8. It is undisputed that at least a "couple of times" in 2020, Van Neck discussed with the plaintiff issues with delays, offered advice on how to prevent delays and told her that she needed to keep on top of orders and on top of vendors and to stay in communication with the service department. Dkt. No. 41 at ¶36.

After the 2019-20 performance review meeting, Van Neck continued to receive complaints from the service department and branch offices, asserting that the plaintiff was not providing information in the system with shipping dates and not providing up-to-date information. Id. at ¶43. On September 4, 2020, the plaintiff received a "Corrective Action Notice" for screaming at another employee for talking too loudly in the break room. Id. at ¶45.

The plaintiff has not presented any evidence to dispute these facts. Although she says that she never was suspended or written up for her performance-based issues, she doesn't dispute that she was slow in expediting parts or providing updates to the service department. The plaintiff has not shown that she was meeting her employer's legitimate expectations when it terminated her.

Even if the plaintiff could show that she was meeting the defendant's legitimate expectations at the time it terminated her, she cannot satisfy the fourth prong of the mini-reduction *prima facie* case. She cannot show that the majority of her duties were absorbed by employees *not* in the protected class

(people over forty), because the majority of her job duties were assumed by employees over forty. While the plaintiff argues that *some* of her job duties were absorbed by two individuals outside of her protected class, she does not dispute that the majority of her duties were assumed by Yanke and Van Neck, both of whom were older than the plaintiff. Dkt. No. 41 at ¶¶125, 131. In <u>Petts</u>, 534 F.3d 715, 726 the Seventh Circuit concluded that a plaintiff could not establish the fourth prong of a mini-RIF *prima facie* case where her duties were absorbed by employees both within and outside of her protected class. Courts in this circuit have concluded that a plaintiff must show duties were absorbed *mostly* by younger employees. <u>See, *e.g.*</u>, <u>Wells v. EMF Corp.</u>, 757 F. Supp. 2d 791, 802 (N.D. Ind. 2010) (internal quotation omitted) ("To satisfy the fourth prong of his *prima facie* case, [the plaintiff] must show that [his] duties, at the very least, were absorbed *mostly* by employees not in [his] protected class."); <u>Cole v. Ill. Tool Works, Inc.</u> Case No. 03 C 4952, 2005 WL 315963, at *10 (N.D. Ill. Nov. 21, 2005) (plaintiff "must show that her duties, at the very least, were absorbed *mostly* by employees not in her protected class."). Because the plaintiff's job duties were mostly assumed by employees *within* her protected class, she cannot make out a *prima facie* case of age discrimination.

Admittedly, the evidence shows that Van Neck occasionally would make jokes about the plaintiff's age, including in an email in which he called the plaintiff "old and feeble minded." Dkt. No. 33-23 at 17, tr. p. 75 at lines 3-5. But Van Neck's emails and testimony do not support an inference of discrimination. The emails between Van Neck and the plaintiff reveal an

30

amicable relationship. The email in which Van Neck commented on the plaintiff's age was in response to the plaintiff saying that she forgot what she was doing while completing a task; Van Neck responded in jest. Dkt. No. 33-26 at 2. The fact that Van Neck was six years *older* than the plaintiff further supports a finding that the comments were made without discriminatory animus. Van Neck wrote the "old and feeble minded" email on June 11, 2019, nearly two years *before* Carlson terminated the plaintiff. Dkt. No. 33-26. This large window of time between Van Neck's remarks and the decision to terminate the plaintiff is not sufficient to support a finding of age discrimination. See Merillat v. Metal Spinners, Inc., 470 F.3d 685, 694 (7th Cir. 2006) ("isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus."). Even if the emails did raise an inference of age discrimination, "statements by a nondecisionmaker do not satisfy a plaintiff's burden of proof in an employment discrimination case." Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1010 (7th Cir. 2000) (quoting Eiland v. Trinity Hosp., 150 F.3d 747, 751 (7th Cir. 1998); Larimer Dayton Hudson Corp., 137 F.3d 497, 500 n.4 (7th Cir. 1998)). The plaintiff has not shown that Carlson, the person responsible for the termination of her position, harbored any animus against her. Nor has she shown that Van Neck influenced Carlson's decision.

Considering all the admissible evidence and drawing all reasonable inferences in favor of the plaintiff, a reasonable jury could not find that the

defendant terminated the plaintiff because of her age. The court will grant summary judgment for the defendant on the plaintiff's ADEA claim.

## V. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 25.

The court **ORDERS** that the case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 12th day of March, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

32